# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHWESTERN DIVISION

| | |
|---|---|
| BARBARA S. MATTERS ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 11-5033-CV-SW-NKL |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER

Plaintiff Barbara Matters challenges the Social Security Commissioner's denial of her application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401 *et. seq.*, and supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, *et. seq.*

Matters argues that the Administrative Law Judge ("ALJ") erred in (1) failing to find her depression and anxiety severe; (2) failing to consider Dr. Gibbons's order that she elevate her feet above her heart three to four times a day; and (3) failing to provide specific reasons for discounting her credibility. The Court finds error on all three points, and remands for further proceedings.

**I. Factual Background**

The complete facts and arguments are presented in the parties' briefs and will be duplicated

1

here only to the extent necessary.[1] Matters was hospitalized twice due to her mental health, once involuntarily and once voluntarily. (Tr. 228; Tr. 238). Her involuntary inpatient hospitalization for mental health treatment at the St. John's Regional Medical Center occurred when police were called by friends who witnessed Matters threatening homicide to her daughter and threatening suicide and self-mutilation. (Tr. 229). Matters reported that she was not actually going to hurt herself, but was trying to "shock" her daughter into "being normal" after her daughter had first threatened suicide and self-harm. (Tr. 229). At that time, she was assessed a Global Assessment of Functioning ("GAF") score of 20. (Tr. 239).

Matters's second inpatient hospitalization for mental impairments was voluntary. (Tr. 239). Her treating physician, Dr. Orlando, noted that Matters "has been under extreme levels of stress" because of her daughter's suicide and the loss of a dog, among other reasons. (Tr. 241). Dr. Orlando also noted her suicidal ideations and plan. (Tr. 241). Dr. Orlando diagnosed Matters with "Depressive disorder NOS, with anxiety" and assessed a GAF score of 30. (Tr. 243). All of her treating providers noted her depression and anxiety issues. (Tr. 227; Tr. 229; Tr. 263; Tr. 307; Tr. 321; Tr. 322). Matters also received numerous prescriptions for psychiatric medication. She has been prescribed Wellbutrin, Paxil, Cymbalta, Trazadone, and Celexa. (Tr. 232; Tr. 268; Tr. 308; Tr. 324). Additionally, she sought ongoing outpatient mental health treatment at the Ozark Center. (Tr. 221 – 227).

On March 8, 2007, Matters had a consultative psychological evaluation with John Keough, a licensed psychologist. (Tr. 269-71). Matters told Mr. Keough that she attended

---

[1] Portions of the parties' briefs are adopted without quotation designated.

therapy every six months. (Tr. 269). Upon examination, Matters appeared to experience a mild to moderate level of depression, but had no suicidal thoughts. (Tr. 270). Her memory was adequate and she could understand and follow simple instructions. (Tr. 270). Mr. Keough diagnosed Matters as dysthymic with mood disorder and assigned her a GAF of 50 to 70. (Tr. 271). Mr. Keough opined that Matters could understand and remember simple instructions and had only mild to moderate limitations in sustaining concentration and persistence. (Tr. 271). Mr. Keough also opined that Matters had only mild limitations in adjusting to changes and interacting appropriately in social situations. (Tr. 271).

On March 20, 2007, Kenneth Burstin, Ph.D., a state agency reviewing psychologist, completed a mental RFC assessment for Matters. (Tr. 273-74). Dr. Burstin opined that Matters had moderate limitations in understanding and remembering detailed instructions, but had no significant limitations in understanding and remembering simple instructions. (Tr. 273). Dr. Burstin also determined that Matters had no significant limitations in accepting instructions or getting along with co-workers or peers. (Tr. 274).

On August 7, 2009, Matters had a consultative psychological examination with Kevin Whisman, Psy.D. (Tr. 335). She told Dr. Whisman that she was not receiving any mental health treatment. (Tr. 337). She said her stutter was aggravating, but she otherwise felt good about herself. (Tr. 336). She did not think her stuttering was caused by stress, because she did not feel stressed out. (Tr. 336). Upon examination, Matters's affect was normal, her mood was euthymic, and she presented very few symptoms of an emotional disturbance. (Tr. 336). She denied having difficulty interacting with her previous co-workers and expressed

interest in seeking employment. (Tr. 337). Matters had a verbal IQ of 78, a performance IQ of 80, and a full scale IQ of 77. (Tr. 338). Her memory test scores were in the high average range and her Minnesota Multiphase Personality Inventory (MMPI) scores suggested a person attempting to portray a pathological profile. (Tr. 339). Dr. Whisman noted that Matters did not stutter during the examination until she started discussing her stuttering problem. (Tr. 340). Dr. Whisman diagnosed Matters with a conversion disorder, rule out malingering, and assigned her a GAF of 55 to 60. (Tr. 340). Dr. Whisman opined that Matters could understand and remember instructions in most all tasks, sustain concentration and persistence in simple to moderately complex tasks, and interact socially in a restricted environment. (Tr. 340-41, 345-46).

Matters went to Ozark Tri-County Health Care Consortium several times from August 2007 to November 2007. (Tr. 315-22). In August, Matters complained of pain in her lower back, hips, knees, and ankles, but her gait and coordination were normal and she had no edema (swelling). (Tr. 322). The next month, Matters reported stuttering and was diagnosed with anxiety, depression, and back and leg pain. (Tr. 320). In October and November, Matters complained of back pain, but had a normal gait and normal coordination. (Tr. 315-18). She said that her depression level varied. (Tr. 315).

Three months later, on February 18, 2008, Matters returned to Tri-County and reported feeling jittery. (Tr. 313-14). She said she had anxiety, but was doing well with Celexa. (Tr. 313). She had a normal gait and normal coordination. (Tr. 314). Three months after that, on June 10, 2008, Matters complained of gout and ankle pain, but had a steady gait

4

and a full range of motion in all of her extremities. (Tr. 311-12). Her memory was normal. (Tr. 312).

On September 15, 2008, Matters returned to Tri-County and complained of headaches, feet swelling, and left hip pain. (Tr. 309). Her mental status was normal and her memory and mood were good. (Tr. 310). She was instructed to exercise and was diagnosed with sciatic nerve pain, gout, and edema. (Tr. 310). In December 2008, Matters complained of back and leg pain. (Tr. 308). She had tenderness in her lower back, but her gait was steady (Tr. 308). Her affect and memory were good. (Tr. 308). She was counseled to exercise and quit smoking. (Tr. 308).

Matters received care from Dr. Thomas Gibbons of Access Family Care from 2007 - 2009. (Tr. 300 – 326). Dr. Gibbons assessed chronic back pain, depression, anxiety, morbid obesity, peripheral edema, hyperlipidemia, and osteoarthritis among other impairments. (Tr. 300 – 326). To treat Matters's peripheral edema, Dr. Gibbons instructed her to elevate her feet above her heart three to four times per day. (Tr. 304).

Matters had two hearings before an ALJ, because of uncontrollable stuttering at the first hearing. At the second hearing, Matters testified to numerous limitations. She testified to pain in her back, hips, and knees. (Tr. 33). She also testified to uncontrollable stuttering, which she self-assessed as being caused by stress. (Tr. 36). She further testified to unmanageable swelling in her feet and legs. (Tr. 34 – 35). She testified that she elevates her legs to relieve her pain four to five times a day. (Tr. 35). She testified that she cannot stand for very long, and that she must take frequent breaks when doing the dishes. (Tr. 37– 38).

5

She testified that it takes her approximately 30 minutes to walk one block. (Tr. 39). She testified that her medications make her lightheaded and sleepy. (Tr. 39).

The ALJ formulated a hypothetical question to the Vocational Expert ("VE"). (Tr. 41 – 43). It essentially limited the hypothetical person to light work, air conditioned work, and no contact with the general public. (Tr. 42). The VE testified that the hypothetical person could not perform any of Matters's past relevant work. (Tr. 43). The VE further testified that a hypothetical person that was so limited could perform jobs as a clerical mailer, an optical goods assembler, and a semiconductor assembler. (Tr. 43, 44). The VE also testified that if the ALJ found Matters to be 100 percent credible, then Matters would not be able to perform those jobs because of posture and positioning "especially on the laying down or the elevating of the feet." (Tr. 44).

In his written decision, the ALJ found that Matters had severe impairments of obesity, arthritis, degenerative disk disease, adjustment disorder, and conversion disorder. (Tr. 12 – 13). The ALJ found that these impairments did not meet or equal a listing impairment. (Tr. 13). Instead, the ALJ found that the claimant retained the Residual Functional Capacity ("RFC") to perform light work in an air conditioned environment with no more than superficial contact with others. (Tr. 16 – 17). The ALJ then cited the Polaski factors and Social Security Ruling 96-7p. (Tr. 17). The ALJ found Matters's testimony to be non-credible to the extent that it is inconsistent with the assessed RFC (Tr. 17), and the ALJ found that Matters was not disabled based upon the VE's testimony (Tr. 19 – 20).

**II.     Discussion**

In reviewing a denial of disability benefits, the Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007). "Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision." *Cox v. Barnhart*, 245 F.3d 606, 608 (8th Cir. 2003).

### A. The ALJ's Finding Matters's Anxiety and Depression not Severe

The ALJ erred in finding Matters's depression and anxiety not severe. An impairment is not "severe" if it does not have a significant impact on an individual's physical or mental ability to do basic work activities. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard...." *Id*. (internal citations omitted).

The ALJ's decision did not discuss Matters's anxiety and depression, noting only that Matters "testified she found out she is 'depressed' when placed in a hospital center." (Tr. at 17). The ALJ did not specify that the hospitalization referred to was involuntary hospitalization for Matters's threats to kill her daughter, commit suicide, and self-mutilate, or that Matters was then assessed a global assessment functioning score of 20. The ALJ did not mention Matters's voluntary hospitalization, in which she was observed with suicidal thoughts and plans, diagnosed with depressive disorder and anxiety, and assessed a global assessment functioning score of 30. The ALJ also did not address Matters's consistent diagnoses of depression and prescriptions for depression medication.

The ALJ did discuss opinions by Dr. Whisman, Dr. Keough, and Dr. Burstin

7

suggesting that Matters had only slight to moderate mental health and behavior problems that would not interfere with all substantial gainful employment. While the ALJ was free to weigh those opinions against Matters's treatment for depression, the ALJ was required to do so explicitly. *Prince v. Bowen*, 894 F.2d 283, 286 (8th Cir. 1990). In any case, looking to the record as a whole – including the severity of depression reflected by Matters's hospitalizations and the consistency with which treating physicians have diagnosed depression in Matters – substantial evidence does not exist for a finding that Matters's depression is not severe under the Act.

### B. The ALJ's Failure to Evaluate Matters's Edema and Need to Elevate

The record reflects that Matters suffers from edema, or swelling in her feet and legs. In March 2009, Dr. Gibbons diagnosed Matters with edema and instructed her to elevate her feet above her heart three to four times a day. (Tr. at 304). Matters testified at her hearing that she does elevate her feet above her heart four to five times a day, from thirty minutes to an hour at a time, in an effort to reduce swelling. (Tr. at 35). Matters further testified that she cannot stand for long enough to do a load of dishes and that it takes her about thirty minutes to walk a block. (Tr. at 38-39).

The ALJ did not properly consider Matters's edema in reaching his conclusion. The Commissioner admits that the ALJ never discredited Dr. Gibbons's recommendation. [Doc. # 8 at 13]. In fact, the ALJ did not even mention the recommendation in his decision. Thus, there is no evidence that the ALJ factored this limitation into his finding of Matters's residual functional capacity. The ALJ also did not mention this limitation in the hypothetical to a

8

vocational expert that he relied on in finding there were jobs available to Matters in the national economy.

The Commissioner argues that because Dr. Gibbons only made his recommendation one time, and because other doctors on similar visits did not make the same recommendation, that "it is reasonable to assume that Dr. Gibbon's [sic] statement was not a continuing recommendation." [Doc. # 8 at 14]. The Court disagrees. When considering how an impairment affects a claimant's residual functional capacity, an ALJ "is required to consider at least some supporting evidence from a professional." *See Baldwin v. Barnett*, 349 F.3d 549, 556 (8th Cir. 2003) (citing another case in which "medical evidence was required to establish how claimant's heart attacks affected his RFC"). Dr. Gibbons provided his instructions to Matters without limitation, Matters continues to be treated for the condition, and Matters has continued to elevate to relieve her symptoms. There is no evidence on the record that Matters's edema has subsided and no medical opinions stating that elevation is unnecessary. In light of this evidence, the negative inferences urged by the Commissioner would not constitute substantial evidence for the Commissioner's urged conclusion, even if the ALJ in fact entertained them.

If Matters is required to elevate her feet, there is not substantial evidence for an ALJ to conclude that she is not disabled. At Matters's hearing, a vocational expert replied that someone with the impairments in the ALJ's hypothetical would have jobs available in the national economy. But the same vocational expert opined that if the ALJ had found Matters's testimony "100 percent credible" that those same jobs would not be available

9

"because of the posture or positioning. The individual would not be able to complete a normal work day or work week because of having to miss time, especially on the laying down or the elevating of the feet." (Tr. at 44).

On remand, the ALJ must fulfill his duty to fully develop the record concerning whether Matters is required to elevate her feet. *See Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). Dr. Gibbons's one-sentence recommendation does not provide enough information to determine whether Matters is disabled. If Matters, in order to make it through a workday, is and will continue to be required to elevate her feet four to five times a week, then she may be disabled.

### C. The ALJ's Discounting of Matters's Credibility

The ALJ also erred in failing to properly explain why he discredited Matters's credibility. "If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, [the Court] will normally defer to that judgment." *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001). Here, the Court defers to the ALJ's discrediting of Matters's complaints of pain, since the ALJ did so explicitly and stated that it was because Matters failed to seek regular treatment for her pain and because debilitating pain was not consistent with the X-rays in the record.

But the ALJ did not provide any particular reason for discrediting Matters's testimony about her limitations on mobility and restrictions on activity, such as her inability to wash a load of dishes without having to lay down and rest. Further, in discrediting Matters's testimony about her mental limitations, the ALJ simply stated that he concurred with Dr.

10

Case 3:11-cv-05033-NKL   Document 10   Filed 11/02/11   Page 10 of 11

Burstin that Matters "is not precluded from all substantial gainful activity due to a 'mental' impairment." (Tr. at 18). Without further explanation why this single conclusion from a State Agency reviewing psychologist undermines Matters's testimony – and all supporting medical evidence on the record – the ALJ has not provided a "good reason" for the Court to defer to his credibility determination. On remand, the ALJ is instructed to weigh all of the evidence of Matters's physical limitations and mental impairments and to explicitly state his reason for discrediting Matters's testimony.

## III. Conclusion

Accordingly, it is hereby ORDERED that Barbara Matters's Petition [Doc. # 3] is GRANTED. The decision of the ALJ is REVERSED and remanded for reconsideration consistent with this Order.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: November 2, 2011
Jefferson City, Missouri